**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-55515 |
| *Plaintiff-Appellee*, | D.C. No. 2:20-cv-07717-VAP |
| v. | |
| ARTAK OVSEPIAN, | OPINION |
| *Defendant-Appellant*. | |

On Remand from the United States Supreme Court

Argued and Submitted February 5, 2024
Pasadena, California

Filed September 3, 2024

Before: Kim McLane Wardlaw, Michelle T. Friedland, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### 28 U.S.C. § 2255

On remand from the Supreme Court for further consideration in light of *Dubin v. United States*, 599 U.S. 110 (2023), the panel reversed the district court's denial of Artak Ovsepian's 28 U.S.C. § 2255 motion and remanded.

Ovsepian contended that he is factually innocent of aggravated identity theft.

The panel held that a petitioner who was convicted at trial under a divisible statute must demonstrate actual innocence only with respect to the prong(s) for which the petitioner was actually tried and convicted. Because the offense for which Ovsepian was actually tried and convicted was unlawful possession of another's means of identification during and in relation to a conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1028A(a)(1), he need only show innocence as to "possession" to succeed in his § 2255 motion.

In light of *Dubin*, the panel excused Ovseptian's procedural default and concluded that the jury instructions used in his trial were erroneous because they did not convey that his "possession" of another's identifying information must have been at the crux of the healthcare fraud to sustain a conviction of aggravated identity theft. Because no jury so instructed could find Ovsepian guilty of that offense on this record, the panel reversed the denial of the § 2255 motion

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and remanded with instructions to vacate Ovsepian's conviction and sentence on the aggravated identity theft count.

## COUNSEL

Faraz R. Mohammadi (argued), Assistant United States Attorney, United States Department of Justice, Office of the United States Attorney, Santa Ana, California; Bram M. Alden, Assistant United States Attorney, Chief, Criminal Appeals Section; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; Benjamin R. Barron, Keller/Anderle LLP, Irvine, California; for Plaintiff-Appellee.

Benjamin L. Coleman (argued), Benjamin L. Coleman Law PC, San Diego, California, for Defendant-Appellant.

## OPINION

WARDLAW, Circuit Judge:

Artak Ovsepian appeals from the district court's denial of his 28 U.S.C. § 2255 motion.  He contends that he is factually innocent of aggravated identity theft, a crime for which he was prosecuted and convicted at trial.  Our court previously denied Ovsepian's request for a certificate of appealability, and Ovsepian petitioned the Supreme Court for a writ of certiorari of that denial.  While Ovsepian's petition was pending, the Supreme Court issued its decision in *Dubin v. United States*, 599 U.S. 110 (2023), which interpreted the aggravated identity theft statute.  The Court then granted Ovsepian's petition, vacated our denial of a certificate of appealability, and remanded the matter for further consideration in light of *Dubin*.  *Ovsepian v. United States*, 143 S. Ct. 2634 (2023).  In light of *Dubin*, we excuse Ovsepian's procedural default and conclude that the jury instructions used in his trial were erroneous because they did not convey that his "possession" of another's identifying information must have been at the crux of the healthcare fraud to sustain a conviction of aggravated identity theft and, because no jury so instructed could find Ovsepian guilty of that offense on the record before us, we vacate Ovsepian's conviction for aggravated identity theft.

## I.  BACKGROUND

### A.  Factual Background

In 2010 and 2011, Artak Ovsepian participated in a healthcare fraud scheme operating out of a sham medical clinic known as Manor Medical Imaging, Inc. ("Manor"), in Glendale, California.  As charged in the indictment, "Manor

functioned as a 'prescription mill' that generated thousands of prescriptions for expensive anti-psychotic medications" that were medically unnecessary. A medical doctor named Kenneth Johnson allowed Manor employees "to falsely pose as physicians and physician's assistants and to issue the Manor Prescriptions using defendant Johnson's name and Medi-Cal and Medicare billing information." Co-conspirator pharmacists would fill the Manor scripts and bill Medicare or Medi-Cal for the cost of the medically unnecessary prescriptions. Manor would then divert the drugs to the black market for resale to the pharmacies and then likely re-billing to health care programs as though the drugs were being dispensed for the first time.

The conspirators utilized various methods to fill prescriptions and to bill Medicare or Medi-Cal. In some instances, Manor employees recruited low- or no-income, often drug-addicted and/or mentally ill, beneficiaries of Medicare or Medi-Cal to knowingly participate in the fraud in exchange for a kickback. These recruited beneficiaries were brought to Manor where each presented their health care program identification card and obtained a prescription for a psychological medication and at least one other drug. Drivers employed by Manor then transported the recruited beneficiaries from Manor to co-conspirator pharmacies where, under the supervision of the drivers, the beneficiaries presented their Manor prescriptions and identifying information and had those prescriptions filled. The drivers then took the medication from the beneficiaries and delivered it to Manor. The beneficiaries received a cash payment and were dropped off at a parking lot or bus stop.

In other instances, the conspirators relied on Medicare or Medi-Cal beneficiaries' identifying information to obtain prescriptions without the beneficiaries' knowledge or

consent.  Manor employees used the identifying information and patient authorization forms of many elderly Vietnamese beneficiaries, who did not speak English and who came to Manor under the expectation that they would receive legitimate health care, to fill prescriptions in those beneficiaries' names, without their knowledge or consent. Manor employees also relied on identifying information stolen from Medicare or Medi-Cal beneficiaries who never visited Manor to falsify patient authorization forms and to fill prescriptions on those beneficiaries' "behalf," without their knowledge or consent.

Manor employees retained "patient files" in the Manor offices that contained Medicare and Medi-Cal beneficiaries' identifying information, such as copies of healthcare cards and driver's licenses, as well as fabricated medical examination notes.  In October 2010, after an auditor informed one of the pharmacist co-conspirators that several beneficiaries had denied receiving medications prescribed to them at Manor, the pharmacist provided "retraction statements" purportedly signed by some of those beneficiaries retracting their claims of unauthorized billing. At least some of the patient signatures on the "retraction statements" were forged by co-conspirators.

By September of 2010, Ovsepian had joined the conspiracy and taken on a leadership role as the manager of Manor's drivers.  He was arrested approximately one year later, in October 2011, along with numerous co-conspirators.

## B.  Procedural History

### 1.  *Indictment and Trial*

The government charged Ovsepian with conspiracy to commit healthcare fraud and aggravated identity theft,

among other related counts.  The aggravated identity theft statute imposes a mandatory two-year sentence enhancement for any person who, "during and in relation to" an enumerated felony offense, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person."  18 U.S.C. § 1028A(a)(1). The enumerated predicate felonies of § 1028A include, *inter alia*, mail, bank, and wire fraud, and—as relevant here— conspiracy to commit healthcare fraud.  *See* 18 U.S.C. §§ 1028A(c), 1349.  The indictment charged Ovsepian with aggravated identity theft under each of the divisible verb prongs of § 1028A(a)(1)—possessing, using, and transferring a means of identification belonging to another person—during and in relation to the conspiracy to commit healthcare fraud.

At trial, Ovsepian admitted his involvement in the healthcare fraud.  Ovsepian disputed only the aggravated identity theft count.  Although the government originally charged Ovsepian under all three prongs of aggravated identity theft in connection with multiple identity-theft victims, the government narrowed the aggravated identity theft charge against Ovsepian during trial to just "possession" of only one victim's identifying information. The victim, "H.T.," an elderly Vietnamese beneficiary of Medicare and Medi-Cal, testified that she visited Manor believing that she would receive a medical examination for back pain.  In March and May 2010, Manor conspirators used H.T.'s information to bill Medicare for medications purportedly dispensed to H.T.  H.T. testified that she did not authorize the Manor prescriptions dispensed in her name, was not aware of them at the time they were made and dispensed, and never received the medications.  Manor

retained copies of H.T.'s identifying information in a "patient file" at Manor's offices through October of 2011.

Ovsepian testified that he was hired to be a part-time driver for Manor in "late April" or "early May" of 2010. At the time, he believed Manor was a legitimate medical business. After a few weeks of driving for Manor, he began to suspect foul play and started questioning employees at Manor about the business. Around the "late summer" of 2010, Manor employees revealed the nature and extent of the healthcare fraud to him. He confessed that, upon learning of the fraud, he "turned a blind eye" to it and by September of 2010 had taken on the responsibility of managing Manor's drivers.

The jury instructions on Ovsepian's aggravated identity theft charge addressed only the "possession" prong of § 1028A(a)(1). The instructions stated that the jury must find beyond a reasonable doubt that "the defendant knowingly possessed without legal authority a means of identification of another person . . . during and in relation to Conspiracy to Commit Health Care Fraud."[1] Addressing Ovsepian's § 1028A charge in closing arguments, government counsel told the jury that H.T. "is the identity theft victim charged in that case." She continued: "although [H.T.'s identifying information] was used to bill back in March, 2010, her patient file was seized from Manor where it was possessed as part of the conspiracy." Because H.T.'s

---

[1] The district court also provided a *Pinkerton* instruction that a conviction for aggravated identity theft was appropriate as to one conspirator if committed by a co-conspirator "within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement." *See Pinkerton v. United States*, 328 U.S. 640 (1946).

patient file, which contained her identifying information, was kept on Manor's premises "in case anyone comes there to audit" the operation, government counsel argued that H.T.'s file "was possessed in furtherance of healthcare fraud conspiracy" and that the jury should therefore find Ovsepian guilty of aggravated identity theft. The jury found Ovsepian guilty on all counts.

### 2. *Sentencing and Direct Appeal*

The district court sentenced Ovsepian to concurrent sentences totaling 156 months and the mandatory, consecutive, 24-month sentence for the aggravated identity theft conviction. After Ovsepian appealed, we vacated the sentence in part and remanded for resentencing. *United States v. Ovsepian*, 674 F. App'x 712 (9th Cir. 2017). On remand, the district court resentenced Ovsepian to the same 180-month sentence. Ovsepian appealed again, we affirmed, and the Supreme Court denied Ovsepian's petition for a writ of certiorari. *United States v. Ovsepian*, 739 F. App'x 448 (9th Cir. 2018), *cert. denied*, 140 S. Ct. 157 (2019).

### 3. *Postconviction Proceedings*

Ovsepian moved under 28 U.S.C. § 2255 to vacate his aggravated identity theft conviction, arguing that his conduct did not amount to aggravated identity theft. The district court denied the motion and denied Ovsepian's request for a certificate of appealability ("COA"). We also denied Ovsepian's request for a COA. While Ovsepian's petition to the Supreme Court for a writ of certiorari was pending, the Court announced its decision in *Dubin*, in which it held that the "use" prong of § 1028A(a)(1) is violated only when the use of another's means of identification "is at the crux of what makes the [predicate offense] criminal." 599 U.S. at 131. Where the predicate offense is a "fraud or deceit

crime[]" like healthcare fraud, the Court explained, "the means of identification specifically must be used in a manner that is fraudulent or deceptive," such that its use goes to "'who' is involved," not simply "*how* and *when* services were provided to a patient." *Id.* at 131–32.

The Supreme Court granted Ovsepian's petition, vacated our court's denial of a COA, and remanded for further proceedings in light of *Dubin*. *Ovsepian*, 143 S. Ct. at 2634. Upon joint request of the parties, we granted a COA on one issue: "whether [Ovsepian's] 18 U.S.C. § 1028A conviction must be vacated in light of *Dubin*."

After receiving briefing and hearing argument on that issue, we ruled in favor of Ovsepian, reversing the district court's denial of Ovsepian's § 2255 motion and remanding to the district court with instructions to vacate Ovsepian's judgment of conviction on the aggravated identity theft count. Because the parties represented that Ovsepian already had begun serving, or would in a matter of days begin serving, his sentence on the aggravated identity theft count, we issued our dispositive order promptly, on February 7, 2024, with a statement explaining that an opinion would follow in due course. *See United States v. Perez-Garcia*, 96 F.4th 1166, 1172–74 (9th Cir. 2024) (explaining that appellate courts may at times bifurcate an expedited order from an opinion explaining its reasoning when an immediate ruling is warranted). We now provide the rationale for our dispositive order.

## II.  STANDARD OF REVIEW

"We review a district court's denial of a § 2255 motion de novo." *United States v. Seng Chen Yong*, 926 F.3d 582, 589 (9th Cir. 2019) (citation omitted).

## III.  DISCUSSION

### A.  <u>Actual Innocence</u>

Ovsepian contends in light of *Dubin* that he is actually innocent of the crime for which he was convicted: unlawfully possessing the means of identification of another person during and in relation to conspiracy to commit healthcare fraud.  He also contends that the instructions provided to the jury for the aggravated identity theft count were defective under *Dubin* for, among other reasons, failing to require that the possession of the means of identification be "at the crux" of the healthcare fraud scheme.  *Dubin*, 599 U.S. at 132.  The government asserts that Ovsepian's challenge to the jury instruction is procedurally defaulted because it was never raised on direct appeal.  *See Bousley v. United States*, 523 U.S. 614, 622 (1998).

"A federal habeas petitioner can overcome a procedural default . . . by demonstrating actual innocence of the crime underlying his conviction."  *Vosgien v. Persson*, 742 F.3d 1131, 1134 (9th Cir. 2014) (citing *Schlup v. Delo*, 513 U.S. 298, 313–15 (1995); *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)); *see also Bousley*, 523 U.S. at 622 ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" (citations omitted)).  "One way a petitioner can demonstrate actual innocence is to show in light of subsequent case law that he cannot, as a legal matter, have committed the alleged crime" for which he was convicted.  *Vosgien*, 742 F.3d at 1134.  Such a showing is "rare."  *McQuiggin*, 569 U.S. at 386.  "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new

evidence" or new legal developments, "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Larsen v. Soto*, 742 F.3d 1083, 1088 (9th Cir. 2013) (first alteration in original) (quoting *House v. Bell*, 547 U.S. 518, 536–37 (2006)). "[T]he petitioner must 'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) (quoting *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998)).[2]

### 1.   *The Crime of Conviction*

Ovsepian's actual innocence claim requires us to answer a question we have not previously addressed:   When the government has tried, and a jury convicted, a petitioner under only one prong of a divisible statute, must the petitioner demonstrate actual innocence as to that prong only, or as to all divisible prongs of the statute under which he was indicted?   We hold that a petitioner who was convicted at trial under a divisible statute must demonstrate actual innocence only with respect to the prong(s) for which the petitioner was actually tried and convicted.   Because the offense for which Ovsepian was actually tried and convicted was unlawful possession of another's means of identification during and in relation to a conspiracy to commit healthcare

---

[2] "We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable." *Jones*, 763 F.3d at 1246.  Because we find in this case that Ovsepian's actual innocence claim succeeds as a "gateway" claim, *see infra* Section III.B., we need not and do not address whether Ovsepian's claim of actual innocence would provide an independent basis to grant his § 2255 motion.

fraud, he need only show innocence as to "possession" to succeed in his § 2255 motion.

The government argues to the contrary. It contends that because it *could* have tried Ovsepian under a § 1028A "use" theory of liability and indeed originally charged him under § 1028A's use prong, and because a jury could have convicted Ovsepian under such a theory based on the trial record as it stands, Ovsepian is not actually innocent of "conduct . . . prohibited by law." *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011) (as amended). We disagree.

We have previously held that a petitioner asserting actual innocence "need not demonstrate that he [is] actually innocent of *any* criminal wrongdoing. He need only demonstrate that he [is] actually innocent of . . . the counts under which he was convicted." *Vosgien*, 742 F.3d at 1135. Here, Ovsepian's crime of conviction is *possession* of another's means of identification in violation of § 1028A(a)(1). Although the government initially indicted Ovsepian under each of the divisible verb prongs of § 1028A, the government does not dispute that it narrowed its case against Ovsepian at trial to the co-conspirators' unlawful possession of H.T.'s patient file. Consistent with the narrowed presentation of the case at trial, the government endorsed jury instructions limited to the possession prong, the district court provided those instructions to the jury, and the government's closing arguments relied exclusively on the co-conspirators' possession of H.T.'s means of identification on Manor's premises as support for Ovsepian's charge of § 1028A possession. Because we "presume that jurors follow the jury instructions" they are given and do not indulge theories of liability on which they were not instructed, *Doe v. Busby*, 661 F.3d 1001, 1017 (9th

Cir. 2011) (citing *Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007) (en banc)), the jury instructions and the government's presentation in this case establish that Ovsepian's crime of conviction is possession in violation of § 1028A(a)(1).

The government does not dispute this. Rather, it contends that a hypothetical jury could have convicted Ovsepian under § 1028A's "use" prong, if the jury had been instructed on that theory of liability. As support, the government cites statements explaining that claims of actual innocence require the court to inspect "the content of the trial record, not the content of the jury instructions," *Ryan v. United States*, 645 F.3d 913, 917 (7th Cir. 2011), *vacated on other grounds*, 566 U.S. 972 (2012), and "the mere fact of an improper instruction is not sufficient to meet the test for actual innocence," *Stephens v. Herrera*, 464 F.3d 895, 899 (9th Cir. 2006). The government seems to suggest that, although Ovsepian's jury was instructed just on the possession prong, we may look at "the content of the trial record," *Ryan*, 645 F.3d at 917, as a whole to determine whether Ovsepian is actually innocent of crimes not prosecuted.

However, neither of these out-of-context statements suggests that we may look beyond the crime of conviction to determine whether a petitioner hypothetically could be guilty of a crime for which the petitioner did not face conviction at trial. They merely affirm the well-settled proposition that a petitioner asserting actual innocence of his crime of conviction must establish innocence as a matter of fact. *See Bousley*, 523 U.S. at 623. As the Supreme Court has explained, courts adjudicating actual innocence claims must look to "all the evidence," including any evidence not presented at trial, to make a "probabilistic determination

about what reasonable . . . jurors would do," assuming that they were "properly instructed" on the crime for which the petitioner was convicted. *Schlup*, 513 U.S. at 328–29. Because courts consider "the content of the trial record" assuming a properly instructed jury, *Ryan*, 645 F.3d at 917, "the mere fact of an improper instruction is not sufficient to meet the test for actual innocence," *Stephens*, 464 F.3d at 899; *see Ryan*, 645 F.3d at 918 ("The right question . . . is whether, applying current legal standards to the trial record, Ryan is entitled to a judgment of acquittal.").

In *Stephens* and *Ryan*, and many other cases not cited, these straightforward principles have been applied to grant or (in the case of *Stephens* and *Ryan*) reject claims that, in light of developments in the law after trial, petitioners were actually innocent of crimes on which their juries had been erroneously instructed. *See Stephens*, 464 F.3d at 899 (finding "the evidence against Stephens was sufficiently strong that we cannot conclude that it is more likely than not that no reasonable juror, properly instructed as to the elements of the crime, would have found him guilty"); *Ryan*, 645 F.3d at 918 (explaining that the "question . . . is whether, applying current legal standards to the trial record, [the petitioner] is entitled to a judgment of acquittal" on his conviction for mail fraud, and finding him "not entitled to collateral relief" "using the legal standard [for mail fraud] set by *Skilling* [*v. United States*, 561 U.S. 358 (2010)]"). Neither *Stephens* nor *Ryan*, nor any other published appellate decision to our knowledge, extended these straightforward principles to conclude that a petitioner asserting a claim of actual innocence after a trial, in addition to proving his actual innocence of the crime of conviction based on all the evidence, must also prove that he is factually

innocent of an offense for which he was never personally prosecuted at trial.

The government suggests that we can infer a rule requiring actual innocence of all offenses charged—even of offenses not ultimately prosecuted at trial—from the Supreme Court's decision in *Bousley*, 523 U.S. 614 (1998). But *Bousley* supports the opposite rule. The statute at issue in *Bousley*, 18 U.S.C. § 924(c)(1), was nearly identical in structure to the aggravated identity theft statute charged against Ovsepian. Section 924(c)(1) imposes a mandatory sentence enhancement for any person who "uses or carries a firearm," two divisible prongs, "during and in relation to" certain predicate offenses. Bousley was charged with only "use" of a firearm in violation of § 924(c)(1) and was convicted under that statutory prong pursuant to a plea deal. *Bousley*, 523 U.S. at 624. When Bousley later pursued an actual innocence claim based on subsequent developments in the law, the government argued that Bousley needed to prove "that he is actually innocent of both 'using' *and* 'carrying' a firearm in violation of § 924(c)(1)." *Id.* (emphasis added). The Supreme Court summarily rejected that argument, holding that the actual innocence inquiry does not extend to offenses for which the petitioner was not charged—including uncharged prongs of a divisible statute. *See id.* ("[P]etitioner need demonstrate no more than that he did not 'use' a firearm . . . .").

Because Bousley's case involved a plea deal, the Court did not have the occasion to determine what the scope of the actual innocence inquiry would be in a case like Ovsepian's in which the case proceeded to a jury trial and the government prosecuted fewer divisible prongs, theories of liability, or offenses than it originally charged in the indictment. Nevertheless, the government invites us to infer

a permissive rule—that any offense charged falls within the scope of the actual innocence inquiry, even if the case is narrowed at trial—from the Supreme Court's articulation of a restrictive rule in *Bousley*—that the actual innocence inquiry does not extend to crimes that the government never pursued. We reject this logically unsound maneuver.

But the Court's distinction in *Bousley* between indicted and unindicted crimes is still relevant here. That the *Bousley* Court drew the distinction it did informs our analysis of the limits of the actual innocence inquiry. Rather than looking to the full universe of all possible offenses for which a petitioner could have been convicted based on his conduct, *Bousley* instructs us to ask only whether the petitioner is factually innocent of the offense for which the petitioner personally faced conviction. *Vosgien*, 742 F.3d at 1135 (citing *Bousley*, 523 U.S. at 624) ("Vosgien need not demonstrate that he was actually innocent of *any* criminal wrongdoing. He need only demonstrate that he was actually innocent of compelling prostitution, the counts under which he was convicted.").[3]

---

[3] *United States v. Sorrells*, 145 F.3d 744 (5th Cir. 1998), is not to the contrary. There, the Fifth Circuit held that a petitioner who was convicted of a firearm offense at trial was not actually innocent if he could have been convicted of the same offense under an aiding and abetting theory. The *Sorrells* court emphasized that its holding turned on the unique nature of aiding and abetting liability and the jury instructions provided at Sorrells' trial. *See id.* at 752. The court explained that aiding and abetting is unique because a person may be convicted of aiding and abetting even if not specifically charged with aiding and abetting; that aiding and abetting is not itself a "separate crime," but is rather a "*means* of convicting someone of the underlying offense"; and that "the issue of aiding and abetting was properly before

The offense(s) for which a petitioner personally faces conviction necessarily depends on the circumstances of the proceedings and the stage of those proceedings at which the petitioner was convicted. *Bousley* makes clear that the actual innocence inquiry does not extend to an offense for which the petitioner never faced charges. *See Bousley*, 523 U.S. at 624. *Bousley* also explains that if the government as part of plea negotiations did not pursue "more serious" charges against the petitioner in exchange for a guilty plea on lesser conduct, the "petitioner's showing of actual innocence must also extend to th[e more serious] charges."**[4]** *Id*. Absent the

---

the jury" because the jury in Sorrells' trial received "a general aiding and abetting instruction . . . explaining its elements, and Sorrells did not (and . . . still does not) challenge the correctness of this jury charge." *Id*. (emphasis added). In short, *Sorrells* did not concern the scenario we are presented with here, in which a petitioner was prosecuted and convicted under only one prong of a divisible statute and no instructions were provided to the jury on the other prongs.

[4] In *Vosgien*, we explained that a petitioner must demonstrate actual innocence of more serious charges that were dismissed in exchange for a guilty plea on lesser offenses because, otherwise, a petitioner who is actually innocent of a lesser charge but may not be factually innocent of the more serious offenses for which they were charged would unjustly benefit from "a prosecutor's leniency in agreeing to conviction on less serious, but now invalid, counts in obtaining the plea." 742 F.3d at 1136. In cases in which the petitioner pleaded guilty to an offense and the government did *not* drop more serious charges in exchange for the plea, "[t]his concern is not present . . . and [the petitioner] need not demonstrate his innocence as to other more serious but uncharged offenses." *Id.* (internal quotation marks omitted). Such a concern is also not present when a case proceeds to trial and the government narrows the indictment as a strategic matter. That is especially true in a case like Ovsepian's where the non-prosecuted divisible prongs of a statute are no "more serious" than the prong which the government elected to try. *Bousley*, 523 U.S. at 624.

parties' bargained-for outcome, the petitioner faced possible conviction of the more serious charges.[5]

The locus of the inquiry necessarily shifts if the petitioner was convicted at trial. In those cases, the offense(s) for which the petitioner personally faced conviction depends on which charges from the indictment survived to trial, the theories of liability the prosecution presented to the jury, the verdict form, and, perhaps most importantly, the instructions the trial court provided on the offenses at issue. These factors, not the indictment that initiated the criminal proceedings or the scope of the plea negotiations, ultimately determine the criminal liability for which the defendant personally faces conviction at trial. When faced with an actual innocence claim arising out of a trial, a court must inquire whether it is more likely than not, in light of all the evidence, that any reasonable juror properly instructed on the offense or theory of liability of which the

---

[5] In *United States v. Caso*, 723 F.3d 215, 219–20, 222 (D.C. Cir. 2013), the D.C. Circuit encountered the inverse scenario, in which the charge which the government forwent as part of plea bargaining was "*less* serious" than the charge for which the defendant pleaded guilty. The D.C. Circuit held that if the forgone offense "is less serious than the offense of conviction," the petitioner need not demonstrate actual innocence as to the former. *Id.* at 223. The court explained that "it would plainly be unfair to force the defendant to suffer the greater penalty associated with a crime of which he can demonstrate his innocence. . . . To put the point more sharply: we should not require a person to spend 30 years in prison on an erroneous murder conviction because he was guilty of an uncharged theft offense that would carry a sentence of one year." *Id*. We express no view on *Caso*'s holding, but rather offer the case as an illustration of the ways in which the scope of the actual innocence inquiry may shift depending on the circumstances of the proceedings and the stage of those proceedings at which the petitioner was convicted.

petitioner was convicted at trial would have a reasonable doubt about the petitioner's guilt for *that* offense.[6]

The propriety of this rule is evidenced by the sweeping breadth of its logical inverse. If we adopted the government's position that "actual innocence" requires demonstrating factual innocence of criminal liability not prosecuted at trial, petitioners who are factually innocent of the offenses for which they were convicted would remain imprisoned for criminal conduct they were not convicted of—and *could never have been convicted of* at their trial—because it was never put to the jury. Such an outcome would be manifestly unjust and would unfairly confer a windfall on the government for strategically narrowing its case at trial. It would also eviscerate the actual innocence exception by effectively requiring the petitioner to prove that they were actually innocent of every hypothetical crime in the world.

Because the offense for which Ovsepian personally faced conviction at his trial and now proclaims his innocence is possession of another's means of identification in

---

[6] Our application of the actual innocence rule is consistent with *United States v. Baxter*, 761 F.3d 17, 27 n.14, 29 (D.C. Cir. 2014), in which the D.C. Circuit held that, when a jury is instructed on multiple alternative theories of guilt and returns a general verdict, a petitioner must establish actual innocence as to each theory of the offense on which the jury was instructed, at least where each theory would have led to the same or greater sentence upon conviction. The D.C. Circuit's rationale for this holding was the same as the rationale we provide here: the theories presented to the jury and the law on which the jury is instructed ultimately determine the criminal liability for which the defendant personally faces conviction at his trial. *See id.* at 27–29. Unlike in *Baxter*, the prosecution here made a strategic decision to limit its theories of guilt to a single theory—§ 1028A possession. That is the offense "of which [Ovsepian] was convicted . . . and [Ovsepian] must demonstrate his actual innocence of that offense." *Id.* at 29.

violation of § 1028A(a)(1), we inquire whether Ovsepian is actually innocent of that offense only.

### 2. *Actual Innocence*

In *Dubin*, the Supreme Court considered whether a defendant "used" another's means of identification in violation of § 1028A(a)(1) when he submitted a fraudulent bill to Medicaid that overstated the services provided to a patient. 599 U.S. at 114–15. The government argued in *Dubin* that "[a] defendant uses a means of identification 'in relation to' a predicate offense if the use of that means of identification facilitates or furthers the predicate offense in some way." *Id.* at 117 (internal quotation marks omitted). Thus, if a defendant "fraudulently inflate[d] the price of a service or good they actually provided," it would be "enough" to sustain a § 1028A conviction if the "billing or payment method employ[ed] another person's name or other identifying information." *Id.* at 114.

The Court rejected "such a boundless" and "near limitless" interpretation of § 1028A(a)(1), the "staggering breadth" of which would seem to apply "virtually all of the time." *Id.* at 114, 117–18, 129. It agreed with Dubin's "more targeted reading" of the statute, and it cited with approval our court's precedent as well as other circuit decisions that provided "more restrained readings of the aggravated identity theft statute." *Id.* at 116–17 (citing *United States v. Hong*, 938 F.3d 1040, 1051 (9th Cir. 2019)). The Court held that a defendant's use of another's means of identification must be "at the crux of what makes the predicate offense criminal, rather than merely an ancillary feature of a payment method" to trigger liability under § 1028A(a)(1). *Id.* at 117. "When the underlying crime involves fraud or deceit, as many of § 1028A's predicates

do, this entails using a means of identification specifically in a fraudulent or deceitful manner." *Id.* As the Court explained, "[s]uch fraud or deceit going to identity can often be succinctly summarized as going to 'who' is involved," not "misrepresenting *how* and *when* services were provided to a patient." *Id.* at 132.

The Court found that Dubin's conviction did not satisfy that standard. *Id.* Although Dubin undoubtedly "used" a patient's means of identification in the literal sense when he submitted the fraudulent billing containing the patient's name and Medicaid reimbursement number, the "use of the patient's [information] was not at the crux of what made the underlying overbilling fraudulent." *Id.* Rather, "[t]he crux of the healthcare fraud" in Dubin's case "was a misrepresentation about the qualifications of [Dubin's] employee." *Id.* Dubin "misrepresent[ed] *how* and *when* services were provided to a patient," but he did not misrepresent "*who* received the services." *Id.* His "use" of the patient's identifying information, therefore, did not fall within the meaning of § 1028A(a)(1). *Id.* Although *Dubin* concerned only the "use" prong of § 1028A(a)(1), the Court explained that for each of the verbs "the means of identification [must] be at the crux of the criminality" of the charged predicate offense. *Id.* at 127; *see id.* at 132.

The facts presented in Ovsepian's case do not satisfy this standard. We emphasize from the start, however, that the facts presented by this appeal are unusually narrow. The parties agree that although the indictment identified multiple victims of identity theft, at trial, the government limited the aggravated identity theft count to Ovsepian and his co-conspirators' possession of only H.T.'s means of identification. Since Ovsepian filed his § 2255 motion arguing that he is actually innocent of § 1028A possession,

the government has not pointed to any evidence other than the co-conspirators' conduct with respect to H.T. that a reasonable juror could rely upon to support a § 1028A conviction. Ovsepian contends, and the government agrees, that the government had an opportunity to point to such evidence at the district court, as well as to adduce additional evidence not presented in the criminal proceedings, but did not avail itself of either opportunity. The government also agrees that it had the opportunity after *Dubin* to seek a remand to the district court to offer additional evidence, or to expand the record on appeal, but did not avail itself of those opportunities, either. At bottom, the parties agree that the record before us concerns H.T. only, and that we may decide the merits of Ovsepian's appeal based on this record as it stands.[7]

Relying on that record, Ovsepian contends that he is actually innocent of possessing another's means of identification in violation of § 1028A. The government presented no evidence that Ovsepian himself ever possessed H.T.'s identifying information. If *Pinkerton* liability applies, Ovsepian could be liable only for his co-conspirators' conduct that occurred after he joined the conspiracy. *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992); *see United States v. Garcia*, 497 F.3d 964,

---

[7] Ovsepian, of course, carries the burden to demonstrate, "in light of all the evidence," that it is more likely than not that no reasonable juror, properly instructed on the law, would convict him. *Bousley*, 523 U.S. at 623 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327–28). However, that standard does not relieve the government of the need "to rebut any showing that [a] petitioner might make." *Id.* at 624. In this case, Ovsepian has argued, and the government has forthrightly conceded, that the government's rebuttal is limited to the co-conspirators' conduct with respect to H.T. only.

967 n.1 (9th Cir. 2007). Ovsepian argues that by the time he joined the conspiracy, the co-conspirators had already used H.T.'s identifying information to fraudulently obtain prescriptions and were simply maintaining the identifying information in a "patient file" onsite at Manor. Because healthcare payment programs require the maintenance of patient files, the co-conspirators kept a copy of H.T.'s patient file onsite so that they would appear to be compliant with the rules in the event Manor was audited. Ovsepian contends that simply keeping H.T.'s file in Manor's offices was not at the crux of what made the medically unnecessary prescriptions and fraudulent billings to Medicare and Medi-Cal criminal.

In response, the government argues that maintaining H.T.'s patient file onsite was at the crux of the conspiracy to commit healthcare fraud because it enabled the co-conspirators, in the event of a possible audit, to maintain the façade of a legitimate medical clinic and thereby "continue the fraud" "in whatever form"—including in ways that would be at the "crux" of the fraud. The government argues that because the co-conspirators' possession of H.T.'s information could enable them to survive an audit and thereby continue pursuing the prescription fraud, the possession was in fact "central to the implementation of the fraud."

The government's response, however, fails to address *Dubin*'s clear instruction that, for § 1028A liability to attach, "the means of identification [must be] at the crux of what makes the predicate offense criminal, rather than merely an ancillary feature" of that offense. 599 U.S. at 117. The government argues that maintenance of H.T.'s patient file could have, and perhaps did, allow the conspiracy to continue undetected. But the Court in *Dubin* sought "[t]o be

clear" that merely *facilitating* a predicate offense is not enough. *Id.* at 131–32 ("[B]eing at the crux of the criminality requires more than a causal relationship, such as 'facilitation' of the offense or being a but-for cause of its 'success.'" (citation omitted)); *see id.* at 118 (explaining that for a means of identification to be at the "crux" of a fraud crime, it must "be integral to what made the conduct fraudulent" (internal quotation marks omitted)).

The facts in *Dubin* illustrate the difference between mere facilitation and being at the "crux" of a healthcare fraud. Dubin's misuse of a patient's identifying information in a billing statement to inflate the value of the services provided to the patient undoubtedly lent Dubin's fraud a façade of legitimacy, but the Court found that it did not "itself play[] a key role" in the criminality of the healthcare fraud because it was not at the crux of what made Dubin's conduct *fraudulent*. *Id.* at 129. "The crux of the healthcare fraud" in Dubin's case "was a misrepresentation about the qualifications of petitioner's employee. The patient's name was an ancillary feature of the billing method employed." *Id.* at 132. Because "[Dubin's] fraud was in misrepresenting *how* and *when* services were provided to a patient, not *who* received the services," Dubin's use of the patient's means of identification may have facilitated the fraud, but it "was not at the crux of what made the underlying overbilling fraudulent." *Id.*

Ovsepian's case is analogous to Dubin's. The healthcare fraud prosecuted by the government involved misrepresentations both as to how and when prescriptions were provided, whether such prescriptions were medically necessary, and, in some instances, who was receiving the prescriptions. Without a doubt, the co-conspirators in some instances mis*used* victims' means of identification—

including H.T.'s—in order to deceive Medicare and Medi-Cal as to *who* was receiving the prescriptions. But the government made the strategic choice not to pursue a "use" charge against Ovsepian. On this record, the co-conspirators' retention of H.T.'s patient file to protect against a possible audit did not play a "key" or "integral" role in the conspiracy to commit healthcare fraud. *Id.* at 118, 129. Possessing H.T.'s information without her authorization in a patient file onsite may have lent Manor the air of legitimacy and thereby helped Manor to survive an audit, but it was not at the "crux" of the conspiracy to commit healthcare fraud. *See id.* at 118, 132.[8] It was, rather, an "ancillary feature" of the scheme that merely facilitated its commission. *Id.* at 132.

We emphasize again that the government made a strategic choice not to prosecute Ovsepian at trial under either the use or transfer prongs of § 1028A(a)(1) and to

---

[8] The government contended at oral argument that a reasonable juror could conclude that Ovsepian joined the conspiracy prior to his co-conspirators' use of H.T.'s identifying information to fraudulently bill for prescriptions in March and May of 2010. The government also pointed to evidence that, after Ovsepian's clear entry into the conspiracy, his co-conspirators misused H.T.'s identifying information in a manner that could potentially violate § 1028A's "use" prong when they forged H.T.'s signature on statements designed to throw off investigators. We understand the government's statements to be directed only at § 1028A's use prong, which, as we have already explained, is not at issue in Ovsepian's § 2255 motion. We do not understand the government to be arguing that any "use" that may have occurred in violation of § 1028A(a)(1) while Ovsepian was part of the conspiracy necessarily entailed "possession" in violation of § 1028A(a)(1). To the extent the government intended to make such an argument either in its briefing or at oral argument, it failed to do so "specifically and distinctly," and we therefore do not address it. *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005).

focus instead on § 1028A possession. Even after *Dubin* was decided, the government made a strategic choice to limit the evidence and arguments presented in response to Ovsepian's § 2255 motion to victim H.T. only. On this unique record, Ovsepian has established actual innocence of the offense for which he personally faced conviction at his trial. In light of *Dubin*'s crux requirement, it is more likely than not that no reasonable juror properly instructed on the possession prong of § 1028A(a)(1) could find Ovsepian guilty of § 1028A(a)(1) possession.[9]

## B. Defective Jury Instructions

Under *Schlup*, Ovsepian's showing of actual innocence may act as the "gateway" through which we review his procedurally defaulted claim that the instructions provided to the jury in his trial were defective.[10] 513 U.S. at 315 (quotation marks omitted). We agree with Ovsepian that the instructions were substantively defective under *Dubin*.

---

[9] We do not address Ovsepian's argument that there is no evidence that H.T.'s means of identification were stolen, because even assuming the co-conspirators unlawfully possessed the means of identification, that possession was not at the crux of the predicate offense for which Ovsepian was prosecuted for the reasons already explained. We likewise do not reach Ovsepian's argument that *Pinkerton* liability does not apply to § 1028A.

[10] Because we find that Ovsepian's actual innocence claim succeeds as a gateway to addressing his defective jury instructions claim, we do not reach Ovsepian's argument that his trial counsel's alleged ineffective assistance of counsel excuses the procedurally defaulted jury instructions claim.

The court instructed the jury at Ovsepian's trial that it must find, beyond a reasonable doubt, that:

> First, the defendant knowingly possessed without legal authority a means of identification of another person;
>
> Second, the defendant knew that the means of identification belonged to a real person; and
>
> Third, the defendant did so during and in relation to Conspiracy to Commit Health Care Fraud, as charged in Count One of the indictment.

The instructions defined "knowingly," "possessed," and "means of identification," but did not define "in relation to."[11]  As the Court explained in *Dubin*, the phrase "in relation to" is "context sensitive" and, if "taken to extend to the furthest stretch of its indeterminacy," would be practically limitless.  599 U.S. at 119 (quotation marks omitted).  The Court therefore found it "necessary" to "go beyond the unhelpful text" and "look to statutory context" to interpret the meaning of the phrase in § 1028A(a)(1).  *Id.* (quotation marks omitted).  That context, as we have already explained, favored a "narrower reading," according to which

---

[11] The possession instruction provided: "A person has possession of something if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it.  More than one person can be in possession of something if each knows of its presence and has the power and intention to control it."  The instruction understandably did not provide that a defendant "possesses" under the meaning of § 1028A(a)(1) when the possession is at the crux of what makes the predicate offense criminal, as *Dubin* had not yet been decided.

the verb prongs of § 1028A(a)(1) and the phrase "in relation to" are read together to mean that the possession, use, or transfer of another's means of identification must be "at the crux of the criminality" of the charged predicate offense. *Id.* at 120.

Given the indeterminacy of the phrase "in relation to" and the Court's adoption of a "narrower reading" of the phrase in *Dubin*, the undefined invocation of the bare and "unhelpful text" in the jury instructions at Ovsepian's trial could not have conveyed the more precise understanding of § 1028A that *Dubin* requires. *Id.* at 119–20. The instructions did not inform the jury that a defendant "possesses" another person's means of identification "in relation to" a predicate offense only when the possession is at the crux of what makes the predicate offense criminal— or, in this case, fraudulent—as *Dubin* requires. *See id.* at 131. An instruction of that sort was necessary to capture the meaning of the words in the statute and to avoid the "near limitless" alternative which the Court rejected in *Dubin*. *Id.* at 118.

The failure to include such an instruction prejudiced Ovsepian. We have already concluded in light of *Dubin* that it is more likely than not that no reasonable juror properly instructed on § 1028A(a)(1) could find Ovsepian guilty of § 1028A possession. Given that conclusion, we have no trouble finding, "in light of the record as a whole," that the failure to instruct the jury in Ovsepian's case in conformance with *Dubin* "had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003) (per

curiam) (emphasis omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).**[12]**

## IV.  CONCLUSION

Ovsepian has made a showing of actual innocence and defective jury instructions in light of *Dubin*.  As we held in our order dated February 7, 2024, we reverse the district court's denial of Ovsepian's § 2255 motion, and remand with instructions to vacate Ovsepian's judgment of conviction and sentence on the aggravated identity theft count.

**REVERSED, VACATED, and REMANDED.**

---

[12] We do not address Ovsepian's "freestanding" claim of ineffective assistance of counsel because Ovsepian's defective jury instructions claim independently warrants vacatur of his aggravated identity theft conviction.