**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

TAMARA YVONNE MOTLEY,
AKA Tamara Ogembe, AKA Tamara
Motley-Ogembe,

*Defendant - Appellant*.

No. 23-3971

D.C. No.
2:17-cr-00774-
FMO-1

OPINION

Appeal from the United States District Court
for the Central District of California
Stanley Blumenfeld, Jr., District Judge, Presiding

Argued and Submitted September 17, 2025
Pasadena, California

Filed February 24, 2026

Before: Richard R. Clifton, Jay S. Bybee, and Kenneth K.
Lee, Circuit Judges.

Opinion by Judge Bybee

# SUMMARY[*]

## Criminal Law

The panel vacated a portion of Tamara Motley's sentence and remanded for resentencing in a case in which a jury convicted Motley of defrauding Medicare by submitting millions of dollars in false and fraudulent claims for durable medical equipment and related services.

Motley's underlying healthcare fraud was not in dispute. The sole question was whether Motley also committed aggravated identity theft under 18 U.S.C. § 1028A(a)(1) because the companies Motley used to submit the false claims were enrolled in Medicare under her relatives' names, not her own. Aggravated identity theft carries a mandatory, consecutive two-year prison term if "during and in relation to" a predicate offense, a defendant "uses, without lawful authority, a means of identification of another person."

On the eve of trial, the Supreme Court decided *Dubin v. United States*, 599 U.S. 110 (2023). *Dubin* significantly narrowed § 1028A(a)(1) by holding that a "defendant's misuse of another person's means of identification" must be "at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." The panel held that Motley's § 1028A(a)(1) conviction cannot stand because the government failed to advance a theory at trial that the use of her relatives' names

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

was "critical to the success" of the scheme and that the use *itself* was fraudulent or deceitful.

## COUNSEL

Kristen A. Williams (argued), Assistant United States Attorney, Chief, Major Frauds Section; Julian L. Andre, David H. Chao, Assistant United States Attorneys; Lindsey G. Dotson, Assistant United States Attorney, Chief, Criminal Division; Joseph T. McNally, Acting United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Plaintiff-Appellee.

Ellis M. Johnston III (argued), Clarke Johnston Thorp & Rice PC, San Diego, California, for Defendant-Appellant.

# OPINION

BYBEE, Circuit Judge:

Appellant Tamara Motley was convicted after a jury trial for defrauding Medicare by submitting millions of dollars in false and fraudulent claims for durable medical equipment and related services. Motley's underlying healthcare fraud is not in dispute. The sole question is whether Motley also committed aggravated identity theft under 18 U.S.C. § 1028A(a)(1) because the companies Motley used to submit the false claims were enrolled in Medicare under her relatives' names, not her own. Aggravated identity theft carries a mandatory, consecutive two-year prison term if "during and in relation to" a predicate offense, a defendant "uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1). On the eve of trial, the Supreme Court decided *Dubin v. United States*, 599 U.S. 110 (2023). *Dubin* significantly narrowed § 1028A(a)(1) by holding that a "defendant's misuse of another person's means of identification" must be "at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." *Id.* at 114. We hold that Motley's § 1028A(a)(1) conviction cannot stand because the government failed to advance a theory at trial that the use of her relatives' names was "critical to the success" of the scheme and that the use *itself* was fraudulent or deceitful. *United States v. Parviz*, 131 F.4th 966, 972 (9th Cir. 2025). We vacate that portion of her sentence and remand to the district court for resentencing.

# I. BACKGROUND

## A. *Factual Background*

Tamara Motley operated Action Medical Equipment and Supply, Inc. (Action) and Kaja Medical Equipment & Supply, Inc. (Kaja), two durable medical equipment (DME) companies enrolled as Medicare providers. Action was incorporated in the name of her mother, Beverly Muntz, while Kaja was incorporated in the name of her nephew, Bryant Brown. Neither played an active role in the management of the companies, nor was either implicated in the fraudulent scheme we describe below.

Medicare permits DME supply companies, physicians, and other healthcare providers to seek reimbursement for covered services provided to eligible beneficiaries, typically individuals aged 65 or older or those with disabilities. To receive reimbursement, a DME supplier must enroll in Medicare and certify that it will comply with all rules and regulations, including not submitting false or fraudulent claims. Once enrolled, Electronic Data Interchange (EDI) and Electronic Funds Transfer (EFT) agreements allow suppliers to submit claims electronically and to receive payment directly to their business bank account. Electronic claims include, among other things, the beneficiary's name and identifier, the billed item or service, the date of service, and the supplier's identifying numbers.

With the help of co-defendants Cynthia Marquez, the office manager, and Juan Murillo, a repair technician, Motley orchestrated a scheme to exploit the reimbursement system. The gist of the scheme was simple: Use patient information to submit claims for DME and related services for patients who did not need those items and services and often did not even receive them.

The scheme worked as follows. Motley recruited and paid illegal kickbacks to marketers who brought in patients. Using lists of eligible Medicare beneficiaries, marketers solicited patients, referred them to Action and Kaja, and collected their patient information. Many of these beneficiaries were elderly or non-English speakers. The marketers transported beneficiaries not to their regular physicians, but to complicit physicians who, after cursory examinations, would write prescriptions for medically unnecessary DME, including power wheelchairs and orthotics. At times, the physicians prescribed DME without even examining the beneficiaries; at other times, they simply wrote and signed blank prescriptions to be filled in later by Motley and others. The schemers would then deliver the medically unnecessary DME, whose value was often falsely inflated on delivery tickets and claims, to beneficiaries' homes, where it would collect dust. If no DME was delivered, delivery tickets were created out of whole cloth. Motley and others, acting at her direction, would pick up these prescriptions from the physicians or marketers and, along with fake delivery tickets they generated, create documentation supporting the medical necessity and billing of the DME. Motley then directed Action and Kaja employees to bill Medicare for the medically unnecessary or wholly unprovided DME, and to "max out" the amount Medicare would cover.

When Medicare switched from lump-sum reimbursements for power wheelchairs to a less lucrative monthly rental model in 2011, Motley adjusted her scheme. She transitioned to billing for unnecessary repair and replacement services. Drawing on the ready-made patient base, Action and Kaja employees cold-called prior recipients of wheelchairs, offered free maintenance or equipment, and

persuaded beneficiaries to undergo unnecessary repairs or replacements for their power wheelchairs. To the extent that any services were provided, Action and Kaja technicians made only brief house calls, typically doing little or no work beyond replacing a battery. During the house calls, it was evident that many beneficiaries did not use the wheelchairs or kept them outside their homes or in the garage. Even so, the beneficiaries would sign documents—often in English, despite speaking only Spanish—falsely stating that additional repair and replacement services had been performed. Using this documentation and beneficiary information, the schemers fabricated documentation to make it appear as if the services had been requested, were necessary, and had been performed.

The cash poured in. In total, Action and Kaja submitted more than $24 million in Medicare claims between November 2006 and November 2016. Medicare paid about $13.1 million. To cash out, Motley wrote checks from the Action and Kaja bank accounts, payable to Marquez, Murillo, and others, with false memo lines purporting to cover legitimate business expenses.

B. *Indictment*

For this scheme, the government charged Motley, Marquez, and Murillo with one count of conspiracy to launder monetary instruments, 18 U.S.C. § 1956, and twenty counts of healthcare fraud, *id.* § 1347. The healthcare fraud counts corresponded to distinct fraudulent claims submitted by Action between February 2013 and July 2014 or by Kaja between March 2014 and May 2016. Motley and Marquez were also charged with two counts of aggravated identity theft, *id.* § 1028A, based on the use of the names of Beverly Muntz and Bryant Brown—the owners of Action and Kaja,

respectively—"during and in relation to" the healthcare fraud. Both co-defendants pled guilty before Motley's trial; Marquez's plea deal excluded the aggravated identity theft charge.[1] Motley's first trial ended in a mistrial;[2] the second trial, at issue on appeal, began on June 20, 2023.

## C. *Trial*

During a five-day trial, the government called twenty-eight witnesses, including investigators, former Action and Kaja employees, Medicare patients and their physicians, and members of the Medicare Compliance Team. The government also introduced documentary evidence, including Action's and Kaja's Medicare enrollment applications, EFT agreements, incorporation documents, claims records, financial records, and patient files.

Extensive former employee testimony established that Motley was the effective manager and CEO at Action and Kaja, responsible for spearheading the fraud scheme. Four Medicare patients, one patient's relative, and five physicians testified that the DME provided was not medically necessary, and that any repairs or replacement parts provided years later were likewise unnecessary. For example, one beneficiary testified that after receiving a power wheelchair he never used and did not need, two repairmen arrived

---

[1] Marquez pleaded guilty to a two-count superseding indictment, which charged her with two counts of false statements affecting health care programs in violation of 18 U.S.C. § 1035(a)(2). Murillo pleaded guilty to conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h).

[2] A jury trial was held from February 7 to February 16, 2023. Due to a dangerous and uncooperative juror, a hung jury resulted, and the district court declared a mistrial.

unannounced, and he signed several forms he did not understand.

The evidence of the underlying fraud scheme and Motley's central role in it is not disputed on appeal. At trial, the government sought to support the § 1028A(a)(1) charge through Motley's use of the names of Muntz, her mother, and Brown, her nephew.

A Medicare expert testified that to obtain a Medicare provider number and submit claims, the named owners must agree to comply with Medicare rules and regulations. The named owners—here, Muntz and Brown—certified, among other things, that they would "not submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity." The expert further explained that Medicare operates largely on an "honor system" and relies on provider numbers to match claims with registered providers.

Although Motley effectively managed Action and Kaja, and Muntz and Brown had minimal involvement, the Medicare enrollment paperwork listed only Muntz and Brown as having any official ownership or managerial roles in the companies. Neither enrollment application identified Motley, nor did she appear in any supplemental applications updating ownership and managerial information.

Documentary evidence established that Muntz incorporated Action in April 2006, and Brown incorporated Kaja in March 2011. Both Muntz and Brown had signed EFT authorization agreements, directing Medicare's reimbursements to business bank accounts, both of which listed Motley as an authorized signatory. Finally, powers of attorney showed that Muntz and Brown had granted Motley full authority to run the companies.

In short, the government's trial evidence supporting the aggravated identity theft count rested on the fact that although Action and Kaja were legally owned, incorporated by, and enrolled in Medicare through Muntz and Brown, Motley effectively ran the companies. The government also emphasized that both powers of attorney and Medicare enrollment agreements require lawful use. There was no evidence before the jury, however, that Motley lacked permission or authorization from Muntz or Brown to submit claims or operate the companies; no evidence that Motley, rather than Muntz or Brown, was responsible for enrollment; no evidence as to why the companies were enrolled under her relatives' names; and no evidence that Motley could not have enrolled in her own name or needed their names to submit claims.

D. *Jury Verdict and Sentence*

The jury convicted Motley on all counts. The district court sentenced Motley to 180 months in custody, including 24 consecutive months, the statutory minimum, on the aggravated identity theft counts. The court also ordered Motley to pay restitution of $13,097,237.10 to Medicare and $10,185.70 to Medi-Cal. Motley timely appealed her convictions on the aggravated identity theft counts only.

## II.  DISCUSSION

Motley submits that the government presented insufficient evidence to show that the use of her relatives' names was at the "crux" of the underlying healthcare fraud. We agree.

A. *Standard of Review*

The parties dispute the standard of review for this appeal. A Rule 29 sufficiency-of-the-evidence claim is typically

reviewed de novo. *United States v. Grovo*, 826 F.3d 1207, 1213 (9th Cir. 2016); *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (per curiam). But a Rule 29 motion that is not made or not properly preserved is reviewed for plain error. *United States v. Pelisamen*, 641 F.3d 399, 409 & n.6 (9th Cir. 2011). Generally, a Rule 29 motion made at the close of the government's evidence must be renewed if the defense presents additional evidence, or else plain-error review applies. *Id.* at 409 n.6. But we have also applied de novo review where the defendant moves for acquittal at the close of the government's evidence and does not renew the motion after presenting additional evidence. *United States v. Stewart*, 420 F.3d 1007, 1012, 1014 (9th Cir. 2005); *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002). In *United States v. Esquivel-Ortega*, 484 F.3d 1221 (9th Cir. 2007), we established a futility exception to the renewal requirement. There, after moving for judgment of acquittal at the close of the government's case, the defendant introduced minimal additional evidence, including a voice exemplar and an audio tape, which were played for the jury. *Id.* at 1224. The defense did not then renew the motion at the close of all evidence; even so, we applied de novo review because: "Given the nature of the evidence, and the fact that the court had denied Esquivel's motion for acquittal only a few moments earlier, requiring Esquivel to renew his motion at that point would have been 'an empty ritual.'" *Id.* at 1225 (citation omitted).

Here, after the government rested its case on the final day of trial, defense counsel moved for a judgment of acquittal and confirmed that the record reflected the Rule 29 motion. Defense counsel then presented a final witness related to handwriting analysis. Defense counsel did not renew its motion for judgment of acquittal after its last witness. A

renewed motion would have been the better practice, eliminating any question whether the motion was preserved. Nonetheless, as in *Esquivel-Ortega*, we think Motley did enough to preserve her objection. After making the Rule 29 motion, the defense's additional evidence was minor and almost certainly would not have altered the district court's assessment of the sufficiency of the evidence. Because "it would have been futile for" Motley "to renew h[er] motion following" the final testimony, we review de novo. *Id.* "In any event, the distinction is largely academic, given that, whether review is de novo or for plain error, we must give great deference to the jury verdict and 'must affirm if any rational trier of fact could have found the evidence sufficient.'" *Pelisamen*, 641 F.3d 409 n.6 (citation omitted). In this context, plain error review is only "theoretically more stringent than the standard for a preserved claim." *United States v. Flyer*, 633 F.3d 911, 917 (9th Cir. 2011) (internal quotation marks omitted).

Review of a sufficiency-of-the-evidence challenge requires us "to determine whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To the extent any questions of statutory interpretation are disguised as sufficiency-of-the-evidence arguments, we review them de novo. *United States v. Hong*, 938 F.3d 1040, 1050 (9th Cir. 2019); *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1185 (9th Cir. 2015) (per curiam).

B. *Section 1028A(a)(1) and* Dubin*'s Crux Test*

The aggravated identity theft statute provides that "[w]hoever, during and in relation to" certain enumerated felonies, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1). Healthcare fraud—for which Motley was convicted—is a qualifying predicate felony. *See id.* § 1028A(c)(4). The only element of the § 1028A(a)(1) offense challenged on appeal is whether, in light of *Dubin*, Motley "use[d]" her relatives' names (a means of identification) "during and in relation to" her healthcare fraud.

The Supreme Court in *Dubin* established a new operative test for § 1028A(a)(1). 599 U.S. at 114. Recognizing that § 1028A(a)(1)'s broad statutory language could sweep in "virtually all cases where a defendant employs a means of identification to facilitate a crime," the Supreme Court sought to cabin such expansive readings. *Id.* at 127. The defendant, David Dubin, submitted falsely elevated claims for reimbursement to Medicaid by overstating the qualifications of an employee who performed psychological testing on patients. *Id.* at 114. The government charged Dubin not only with healthcare fraud, 18 U.S.C. § 1347, but also with aggravated identity theft, § 1028A(a)(1), because the fraudulent bills included patients' names and Medicaid reimbursement numbers. *Id.* at 114–15. The issue before the Court was whether Dubin "used" his patients' means of identification "during and in relation to" his healthcare fraud. *Id.* at 116–17.

### 1. *Dubin*'s Statutory and Contextual Analysis

*Dubin* started with the statute's text.  Recognizing the elasticity of the terms "use" and "in relation to," the Court noted that "[r]esort to context" would be "especially necessary" to determine their proper scope.  *Id.* at 119.  The Court first looked to the statute's title:  "Aggravated identity theft."  *Id.* at 120.  The title, the Court observed, was not only "far more targeted" than neighboring statutes but was also set apart from the "identity fraud" statute.  *Id.* at 121.  From these contextual clues, the Court concluded that § 1028A must be "focused on identity theft specifically, rather than all fraud involving means of identification."  *Id.*  The ordinary understanding of "identity theft," not "garden-variety overbilling," lies "at the core of § 1028A."  *Id.* at 122.

The Court then applied the interpretative canon *noscitur a sociis* to § 1028A(a)(1)'s trio of operative verbs—"transfers," "possesses," and "uses."  *See id.* at 126.  "Because 'transfer' and 'possess' channel ordinary identity theft . . . 'uses' should be read in a similar manner . . . ."  *Id.*  Drawing from dictionaries, the Court observed that "identity theft covers both when 'someone *steals* personal information about and belonging to another . . . and *uses* the information to deceive others.'"  *Id.*  (second emphasis added) (quoting *Identity theft*, Black's Law Dictionary 894 (11th ed. 2019)).  The three verbs "capture various aspects of 'classic identity theft.'"  *Id.* (citation omitted).  "Possess" and "transfer" connote theft, while "use" captures a different aspect of classic identity theft:  that "involving fraud or deceit about identity."  *Id.*

Finally, the Court sought guidance from § 1028A(a)(1)'s list of predicate offenses.  *Id.* at 127–29.  Some predicate crimes lack any statutory minimum, whereas § 1028A(a)(1)

carries a particularly harsh two-year minimum. *Id.* at 127. The government's "boundless reading" risked "collaps[ing] the enhancement into the enhanced." *Id.* at 128. Because almost any healthcare fraud involves some form of using another's name, the Court cautioned against sweeping all these into § 1028A(a)(1) "independent of whether the name itself had anything to do with the fraudulent aspect of the offense." *Id.* Instead, § 1028A(a)(1) "targets situations where the means of identification *itself* plays a key role— one that warrants a 2-year mandatory minimum." *Id.* at 129 (emphasis added).

Based on its contextual and statutory analysis, the Court concluded that to "use" another person's means of identification "during and in relation to" a predicate offense under § 1028A(a)(1), a "defendant's misuse of another person's means of identification" must be "at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." *Id.* at 114. Dubin failed to meet this bar through the inclusion of a patient's name on a Medicare reimbursement claim because that use "was not at the crux of what made the underlying overbilling fraudulent." *Id.* at 132. Instead, "[t]he crux of the healthcare fraud was a misrepresentation about the qualifications of petitioner's employee" and "[t]he patient's name was an ancillary feature of the billing method employed." *Id.*

Two requirements animate *Dubin*'s crux test. First, *Dubin* equates the statutory term "use" with "misuse." *Id.* at 114. This captures the Court's repeated requirement that the "use" itself be "fraudulent" or "deceitful." *See*, *e.g.*, *id.* at 123, 126, 132. "When the underlying crime involves fraud or deceit," the Court specified, the means of identification must be used "specifically in a fraudulent or deceitful

manner." *Id.* at 117 (summarizing the petitioner's "more targeted reading"). The Court likewise maintained that "identity theft is committed when a defendant uses the means of identification *itself* to defraud or deceive." *Id.* at 123 (emphasis added). Read together, the Court's warning against collapsing § 1028A(a)(1)'s enhancement into the predicate offense and its insistence that the use itself be fraudulent or deceitful make clear that the fraudulent or deceitful aspect of the identity use must be distinct from— and not duplicative of—the fraud in the underlying healthcare crime. The use of identifiers, in other words, must stand on its own as fraudulent or deceitful; it cannot be so considered simply because it is part of a broader fraudulent scheme. Otherwise, the enhancement would fail to meaningfully distinguish the aggravated-identity-theft charge.

Second, for this misuse to be "at the crux of the criminality," the means of identification specifically must be a "key mover" that carries out the fraud. *Id.* at 123. In causal terms, there must be "more than a causal relationship, such as 'facilitation' of the offense or being a but-for cause of its 'success.'" *Id.* at 131 (citation omitted). Although the Court did not explicitly state how strong of a causal nexus is required for § 1028A(a)(1) liability to attach, we have acknowledged that the misuse of identity must be "critical to the success" of the underlying fraud. *Parviz*, 131 F.4th at 972.

### 2. Caselaw Pre-*Dubin*

Before *Dubin*, our caselaw interpreting § 1028A(a)(1) pulled in two directions; *Dubin* disapproved of one in favor of the other. We first addressed the term "use" in § 1028A(a)(1) in *United States v. Hong*, 938 F.3d 1040 (9th

Cir. 2019). There, the defendant falsely claimed his massage treatments as Medicare-eligible physical therapy. *Id.* at 1043. We adopted the First and Sixth Circuit's "narrow[] constru[ction]" of "use" in *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) and *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015). *Hong*, 938 F.3d at 1050. In *Berroa*, the First Circuit held that physicians with fraudulent licenses who filled prescriptions had not "used" the patients' identities under § 1028A(a)(1) because they had not "attempt[ed] to pass themselves off as the patients." *Berroa*, 856 F.3d at 156. In *Medlock*, the Sixth Circuit established a similar rule. An ambulance service mischaracterized the medical necessity of stretchers on Medicare claims to obtain reimbursement. 792 F.3d at 703–04. The Sixth Circuit reversed the § 1028A(a)(1) convictions, finding that the defendants had not "use[d]" the names and Medicare identification numbers of beneficiaries by including them on the fraudulent claims. *Id.* at 708, 712. The defendants did not "attempt to pass themselves off as anyone other than themselves" and had only "misrepresented *how and why* the beneficiaries were transported." *Id.* at 707.

*Hong* drew from the First Circuit's legislative-history analysis showing that identity theft always "involved the defendant's use of personal information to pass him or herself off as another person, or the transfer of such information to a third party for use in a similar manner." 938 F.3d at 1051 (quoting *Berroa*, 856 F.3d at 156). We then adopted the First Circuit's rule that "use" under § 1028A(a)(1) "require[s] that the defendant attempt to pass him or herself off as another person or purport to take some other action on another person's behalf." *Hong*, 938 F.3d at 1051 (quoting *Berroa*, 856 F.3d at 156). Applying that rule to the facts in *Hong*, we held that because "[n]either Hong

nor the physical therapists 'attempt[ed] to pass themselves off as the patients,'" "Hong did not 'use' the patients' identities within the meaning of the aggravated identity theft statute." 938 F.3d at 1051 (quoting *Berroa*, 856 F.3d at 156); *see also id.* at 1051 n.8 (noting that our sister circuits have affirmed § 1028A(a)(1) convictions of defendants that "purport[ed] to take some other action on another person's behalf through impersonation or forgery" (alteration in original) (quotation marks and citations omitted)).

Later that term, we applied *Hong*'s newly articulated standard in *United States v. Gagarin*, 950 F.3d 596 (9th Cir. 2020). The defendant had "purported to take action on behalf of her cousin" by forging her cousin's signature to open a fraudulent life insurance policy as part of a scheme to collect advances. *Id.* at 603. We upheld the § 1028A(a)(1) conviction and distinguished the facts from *Hong*: By submitting the insurance application in her cousin's name, the defendant had "'attempt[ed] to pass [herself] off' as her cousin through forgery and impersonation." *Id.* at 604 (alteration in original) (quoting *Hong*, 938 F.3d at 1051). The defendant's use of the signature "obscure[d] her own role in the fraudulent application" and "was thus central to the fraud." *Id.*

Finally, in yet a third case that term, we confronted facts between *Hong* and *Gagarin*; the middle path we carved broadened *Hong*'s targeted rule. *United States v. Harris*, 983 F.3d 1125 (9th Cir. 2020). In *Harris*, the defendant submitted fraudulent claims to TRICARE. *Id.* at 1126. The defendant signed the claims in her own name but listed a speech pathologist as the provider even though no services were performed, and the pathologist had not authorized her to do so. *Id.* We found that neither *Hong* nor *Gagarin* "directly control[led] the outcome here"; instead, we

concluded that the defendant's actions fell within the ambit of § 1028A(a)(1) even though she "did not try to pass herself off as [the speech pathologist] through forgery or impersonation." *Id.* at 1127. To reach beyond *Hong*'s rule, we reasoned that "the statutory text does not suggest that 'use' 'refers only to assuming an identity or passing oneself off as a particular person.'" *Id.* at 1128 (quoting *United States v. Michael*, 882 F.3d 624, 627 (6th Cir. 2018)). Instead, "[t]he salient point is whether the defendant used the means of identification to further or facilitate the health care fraud." *Id*. (quoting *Michael*, 882 F.3d at 628) (internal quotation marks omitted).

The broadened standard that *Harris* adopted—that to "use" means to "further or facilitate the health care fraud"— was the government's position that the Supreme Court rejected in *Dubin*. *See Dubin*, 599 U.S. at 117, 131 (noting the government's position as "use of [a] means of identification [that] 'facilitates or furthers' the predicate offense in some way" and holding that "being at the crux of the criminality requires more than . . . 'facilitation' of the offense"); *see also id.* at 118 (characterizing the government's reading as "near limitless" and announcing "a narrower reading"). Thus, *Dubin* requires us to abandon the more sweeping standard we relied on in *Harris*.

At the same time that *Dubin* rejected the broad furthering-or-facilitating standard, it approved of "more restrained readings" and cited our decision in *Hong* as one example. *See id.* at 116 & n.2. Thus, *Hong*'s original rule— that "use" entails purporting "to pass [oneself] off as another person" or "tak[ing] some other action on another person's behalf through impersonation or forgery"—still stands. *Hong*, 938 F.3d at 1051 & n.8 (quotation marks and citation omitted). We will therefore rely on *Hong* rather than *Harris*.

### 3.  Caselaw Post-*Dubin*

We have interpreted and applied *Dubin*'s test in two published decisions.  First, in *United States v. Ovsepian*, 113 F.4th 1193 (9th Cir. 2024), we applied *Dubin*'s "crux" test to a "possession" theory § 1028A charge.  *Id.* at 1208.  The defendant engaged in a "prescription mill" conspiracy that generated thousands of prescriptions for expensive anti-psychotic medications.  *Id.* at 1197.  With the help of complicit doctors and pharmacists writing and filling scripts, conspirators billed Medi-Cal and Medicare for fraudulent prescriptions before diverting the drugs to the black market for resale to the pharmacies.  *Id.* at 1197–98.  The government's narrow argument on appeal was that § 1028A(a)(1) liability attached because the defendant had retained and possessed a patient's file onsite at the clinic "so that they would appear to be compliant with the rules" in case of an audit.  *Id.* at 1207.  We held that although possessing the patient's means of identification might have facilitated the scheme by giving the medical clinic an "air of legitimacy" sufficient to pass an audit, under *Dubin*'s "crux" test, "merely *facilitating* a predicate offense is not enough." *Id.* at 1207–08; *see also id.* at 1208 (observing that retaining a "patient file to protect against a possible audit did not play a 'key' or 'integral' role in the conspiracy to commit healthcare fraud").

We then addressed a § 1028A(a)(1) "use" theory in *Parviz*, 131 F.4th 966.  The defendant was convicted of passport fraud and aggravated identity theft after she submitted a fraudulent passport application on behalf of her minor daughter, over whom she had no parental rights.  *Id.* at 968–70.  To circumvent the requirement that her daughter appear in person for the application, the defendant submitted a false letter with a forged signature from a nurse practitioner

describing the need for a medical exemption.  *Id.*  at 968. We upheld the conviction on appeal, finding that the defendant's actions constituted an "impersonating use" of the identifying information and "involved fraud as to 'who' was making the false representations in the letter."  *Id.* at 972.  We also held that a rational juror could find that the use of the nurse's name, registered nursing number, and signature on the letter "was central to the fraudulent letter's objective of establishing a medical excuse," which was in turn "critical to the success of the fraudulent passport application."  *Id.* at 971–72.  Thus, the misuse of the nurse practitioner's identity lay at the crux because the defendant could not otherwise have presented a successful medical exemption, which was necessary for her fraudulent scheme.

\* \* \*

The throughline that emerges is that when the predicate offense involves fraud or deceit, *Dubin* requires that the manner through which the underlying offense is carried out also involve the "fraudulent or deceitful" use of another's means of identification.  *Dubin* held that the "fraudulent or deceitful" use of another's identification must be in addition to, and not duplicative of, the fraud or deception of the underlying crime; the use of another's identity cannot just form part of (or be used in) the scheme, as this is inevitable in almost all healthcare fraud.  Instead, a "fraudulent or deceitful" use requires the means of identification itself to be used as the vehicle of misrepresentation in the predicate offense.   After all, *Dubin* directed courts to focus on "offenses built around what the defendant does with the means of identification in particular."  599 U.S. at 122.

We will observe here that it is easy to conflate the fraud and deception in the underlying scheme with the fraudulent

and deceitful misuse of another's identity. So a counterfactual may help us separate the strands of ordinary fraud from a fraudulent use of another's identity: If, after removing the underlying predicate criminal behavior from the equation, the use of the means of identification is still considered fraudulent or deceitful, then the use stands on its own as a fraudulent or deceitful use. If, however, the use of the means of identification, considered apart from the predicate offense, is no longer fraudulent or deceptive, then the use falls outside the ambit of § 1028A(a)(1) because any fraud or deceit was merely residual to the fraud and deceit inherent in the predicate crime.

Let's consider how this mode of analysis worked in *Dubin* and our pre- and post-*Dubin* cases. In *Dubin*, without the predicate criminal conduct of inflating Medicare claims by misrepresenting the psychologist's qualifications, there is nothing wrong with using real patients' identifiers on claims; the overall scheme is Medicare fraud, but there has been no fraudulent use of the patients' names. Similarly, in *Ovsepian*, absent the fraudulent prescription mill, keeping a patient's records in an onsite file in case of an audit is not fraudulent or deceitful. The same is true in *Hong*: without the fraud of the predicate healthcare offense—misrepresenting massages as medically necessary physical therapy—the inclusion of a patient's identifiers on Medicare claims is not fraudulent or deceitful. In *Dubin*, *Ovsepian*, and *Hong*, the Supreme Court and we reversed the aggravated identity theft enhancement. By contrast, in *Parviz*, apart from the criminal act of applying for a fraudulent passport, forging a medical professional's signature on a false letter is still a fraudulent and deceptive use of another's identity. Likewise, in *Gagarin*, even apart from the criminal scheme to receive bonuses on fraudulent

life insurance policies, the defendant pretended to be her cousin by forging her signature and submitting a life insurance policy application in her name, which constitutes a separate form of fraud. In both of these cases, we affirmed the aggravated identity theft enhancement.

In short, the predicate offense must be accomplished through the deployment of a fraudulent or deceptive use of means of identification—most often by impersonating or passing oneself off as someone else. And the fraudulent aspect of using the means of identification must stand on its own, separate from the fraud of the underlying crime.

We turn to whether the government presented sufficient evidence here.

## C. *The Government's Theories*

At trial, the government presented several theories as to how Motley's use of her relatives' names was at the crux of the underlying healthcare fraud. We address each in turn.

### 1. Enablement Theory

The government's first theory is that Motley's use of her relatives' names was at the crux because it enabled her to bill Medicare and receive payments. According to the government, Medicare "trusted" in the representations from Muntz and Brown "about who owned and controlled the companies and in the certifications those individuals purportedly made."

To support this theory, the government presented testimony from a Medicare expert that the owner of a medical supply company must be listed on its enrollment application. The enrollment applications request information about anyone with ownership or management

interests in the company and require an authorized official to certify compliance with Medicare regulations. The government then introduced Action's and Kaja's Medicare enrollment applications. Action's application, dated July 10, 2006, listed Muntz as the owner and authorized official. Kaja's application, dated November 7, 2012, listed Brown as the owner, CEO, and authorized official. Muntz and Brown also signed the applications, indicating their intent to ensure that the provider complies with "all applicable statutes, regulations, and program instructions." 42 C.F.R. § 424.510(d)(3). Neither application identified Motley.

But this evidence, even viewed in the light most favorable to the prosecution, fails to establish § 1028A(a)(1) liability under *Dubin*. First, the government did not present evidence that this omission somehow enabled the fraud. Nothing was offered at trial to suggest that Motley was ineligible to register as a provider. To be sure, the claims were approved because they came from providers enrolled in Medicare, but the government failed to show that Muntz's and Brown's specific identities had any bearing on the scheme, much less that they were used in a fraudulent or deceitful manner. In other words, Motley could have signed the enrollment forms herself and still "successfully" completed the fraud scheme.

No evidence showed that Muntz's and Brown's names on the enrollment applications played any role in convincing Medicare to accept the fraudulent claims. In fact, the electronic claims in evidence include only the provider numbers linked to Action and Kaja, not the names of Muntz or Brown. The government offered no evidence at trial that Motley would have been unable to obtain a provider number

on her own or that Medicare would have rejected the claims if the companies had been enrolled under Motley's name. [3]

*Parviz* is an illustrative comparison.  131 F.4th 966.  As Parviz was not a medical professional, she could not have written the fraudulent medical excuse without using someone else's means of identification.  *Id.* at 972 (noting that Parviz "attach[ed] his name and medical position to the *particular* false assertions that were critical to the success of the fraudulent passport application").  A government employee testified that he approved the passport application specifically because he believed the note was written by a licensed medical professional on the letterhead of a legitimate medical facility.  *Id.* at 971.  In stark contrast, the jury in this case heard nothing suggesting that Motley needed to operate through companies incorporated and enrolled in someone else's name to carry out the fraud.  Furthermore, in *Parviz*, the government showed that the particular identity used—a licensed medical professional with no relation to the child—was both a key mover and critical to the crime's success.  Here, by contrast, no government witness testified that Motley's claims were accepted because of the enroller's identity—specifically, that it was Muntz's and Brown's names and not Motley's on the forms that opened the door for the claims' approval.  And because the jury was not presented with any evidence about how Medicare would have reacted had Motley's name been

---

[3] In its answering brief on appeal, the government contends that Motley may have been ineligible to enroll the companies as Medicare providers herself due to her criminal record.  But these past convictions were not presented at trial, and it is unclear whether they would have barred Motley from applying herself.  On appeal, we cannot affirm a criminal conviction on the basis of a theory not presented to the jury.  *Chiarella v. United States*, 445 U.S. 222, 236 (1980).

on the enrollment documents instead, the government did not show that the use of Muntz's and Brown's names was "critical to the success." *Id.* at 972.

The Medicare expert added that providers must submit supplemental enrollment applications whenever there is new "information about who owns or controls or manages the business." Given Motley's managerial role in the companies, it may have violated Medicare regulations to omit her, but this does not establish a fraudulent or deceitful "use" under *Dubin*. The government presented no evidence that the omission was purposeful or fraudulent or that it played a critical role in the fraud. Thus, even with the omission, Motley could have run Action and Kaja in an honest fashion; any misdirection in who ran Action and Kaja was not integral to the fraudulent scheme she perpetrated on Medicare. Further, even if we thought the omission was relevant, as the original enrollers and authorized officials, it was Muntz and Brown—not Motley—who were responsible for updating the enrollment applications. *See* 42 C.F.R. § 424.510(d)(3)(ii) ("[T]he only acceptable signature on the enrollment application to report updates or changes to the enrollment information is that of the authorized official currently on file with Medicare.").

2. Concealment Theory

The government's next theory at trial was that the use of her relatives' names was at the crux of the fraud by allowing Motley to conceal her involvement. In closing argument to the jury, the prosecutor stated: "[Motley] hid behind her relatives on the Medicare enrollment documentation from the very start. She tried to put them out front as the responsible parties, the ones that Medicare would come looking for if it had any question about what was going or

any problems with what was going on at Action and Kaja . . . ." But this theory fails on multiple fronts.

There was no evidence before the jury that Motley's use of her relatives' names concealed her role or that she intended it to. First, it was no secret that Motley controlled the companies. Multiple government witnesses, including investigators, testified that Motley would hold herself out as the "manager in charge" or the "owner." At trial, Special Agent Rochelle Wong testified that she had never interviewed Muntz and had no intention to do so, as it was apparent who was in charge. The jury saw a business agreement between Kaja and Motley, as well as organizational charts listing Motley as holding various officer positions. In short, if Motley sought to conceal her ties to the companies, she failed, and she did not do so by using her relatives' names.

The strongest trial evidence for the concealment theory was a former employee's testimony that during a 2015 audit of Kaja, co-schemer Marquez instructed her to characterize both Motley and her as "consultants." But even viewing this evidence in the light most favorable to the prosecution, it merely reveals that Marquez—not Motley—wanted to minimize their roles. More importantly, because the employee was not instructed to shift blame to Muntz and Brown, any attempted concealment was unrelated to the use of their names. Therefore, no rational juror could find that the fact that Motley ran Action and Kaja was at the crux of the fraud.

The government also contended that Motley's use of her relatives' names concealed that the same person controlled both companies. But this theory also fails. First, it is unclear how or why hiding the two companies' joint operation had

anything to do with enabling the ongoing fraud. Second, trial evidence shows that this joint ownership was no secret. At trial, Agent Wong testified that she knew that "some of . . . the employees were shared between Action and Kaja."

Even if the government showed that the use concealed Motley's role from the government, the concealment theory fails for a more fundamental reason: Motley's use of Muntz's and Brown's names was not *itself* deceptive toward Medicare. The government's trial evidence—Action's and Kaja's enrollment applications and incorporation documents—do not support the claim that Motley's use was "in a manner that is fraudulent or deceptive." *Dubin*, 599 U.S. at 132. First, although the Medicare enrollment applications and supplemental enrollment forms listed only Muntz and Brown, the articles of incorporation showed that Action and Kaja were incorporated by, and legally owned by, Muntz and Brown, not by Motley. As the legal owners, Muntz and Brown—not Motley—were required to be listed on the enrollment applications. *See* 42 C.F.R. § 424.510(d)(3)(ii). And given that ownership, it is not unusual that they certified compliance with Medicare's rules. It is also not unusual—and certainly not illegal—that Motley ran a company owned by a relative.

Second, the government introduced only the enrollment applications; it offered no evidence that Motley personally submitted or signed them on behalf of Muntz or Brown. Without evidence that Motley, rather than Muntz and Brown, incorporated the companies or enrolled them in Medicare, Motley's "use" cannot be premised on the enrollment paperwork and extends, at most, to the submission of fraudulent claims through the companies. But Muntz's and Brown's names do not even appear on the

fraudulent claims; only Action's and Kaja's provider numbers do.

Third, the fact that Motley submitted claims on behalf of the companies, when viewed in isolation, was not deceptive. Medicare does not require the person who enrolls the provider to be the person who submits electronic claims. The jury saw the Medicare EDI enrollment agreements signed by Brown and Muntz stating that the provider "will be responsible for all Medicare claims submitted . . . by itself, *its employees*, or its agents." (emphasis added). As an employee of Action and Kaja, Motley was authorized to submit claims on behalf of the companies, even if her name was not on the enrollment application. Because it was perfectly lawful, ordinary, and expected that she, as an employee, submit claims for the companies, Motley did not "purport[] to take some . . . action on another person's behalf through impersonation or forgery." *Hong*, 938 F.3d at 1051 & n.8 (citation and quotation marks omitted). Thus, Motley's use of her relatives' names in conjunction with the submission of claims did not stand on its own as fraudulent or deceptive toward Medicare. The claims themselves were, of course, fraudulent or deceptive, but the fraud had nothing to do with Brown's and Muntz's names.

The government also failed to show that Motley's use of her relatives' identities was fraudulent or deceptive toward Muntz and Brown. No evidence was presented that Motley had stolen or taken them without permission, or that she was "concealing" the use of her relatives' identities from them. In fact, the trial evidence suggested that Muntz and Brown knew that Motley was operating the companies in their names: Both had executed powers of attorney authorizing Motley to act on their behalf. Indeed, the government's theory at trial was that the fraudulent or deceitful aspect of

Motley's use derived from a use within an unlawful scheme, not that it was unauthorized by Muntz or Brown. The prosecutor stated to the jury that the powers of attorney "permit[] defendant to participate in any legal business of any sort. But, . . . this business was anything but legal." Motley certainly used Muntz's and Brown's companies to facilitate illegal Medicare fraud, but she did not steal their identities or use them without permission. As explained above, mere use of another's identity within an unlawful scheme—without more—is not a use "in a manner that is fraudulent or deceptive" under *Dubin*. 599 U.S. at 132. By failing to show that the use "involv[ed] fraud or deceit about identity," *id.* at 126, independent of the underlying scheme, the government's theory "collapses the enhancement into the enhanced," *id.* at 128. The government's theory in this case would permit a nearly "limitless" reading of § 1028A, which is precisely the reading the Supreme Court rejected in *Dubin*. *See id.* at 118.

And even if Muntz and Brown were unaware of Motley's *criminal* use of their companies, their grievance would be that she betrayed their trust and their companies, not that she stole their identities. The Supreme Court cautioned that the two-year mandatory sentence is meant for a "particularly serious form of identity theft" and that § 1028A(a)(1) should not be read in a manner that turns the "core" of this serious identity theft offense "into something the ordinary user of the English language would not consider identity theft at all." *Id.* at 124. On these facts, a reasonable person may find it unseemly that Motley mismanaged her relatives' companies, but they would not label Motley's conduct as "identity theft." This is especially true considering Muntz and Brown had executed powers of attorney to Motley. The government's theory to the contrary would turn nearly every

employee who commits fraud in the course of their employment into an aggravated identity thief.  The Supreme Court plainly rejected "such a boundless interpretation."  *Id.* at 114.

### 3.  Audit Theory

Finally, the government's "audit" theory fares no better. As the government sees it, Medicare conducts regular unannounced visits to the facilities of enrolled providers, and having Action and Kaja enrolled in another's name permitted Motley to pass these inspections and continue the fraud.  At closing, the prosecutor contended that the use of Muntz's and Brown's names played "a central role in passing inspections that let the defendant's companies keep billing and getting paid."

But this theory is unsupported by the evidence and foreclosed by the law.  On this record, no rational juror could find that Motley fraudulently or deceptively used her relatives' names to pass inspections.  At trial, the compliance officers testified to receiving and reviewing documents, personnel charts, and training materials during visits.  When compliance officers or other investigators visited Action and Kaja, Motley conducted the exit interviews, signed the compliance forms, and provided the records.  During these visits, Motley was perfectly honest regarding the absenteeism of owners Muntz and Brown.  For example, on one occasion, she told a compliance officer that although she was the manager in charge, her nephew was the owner but "travels and does not come into the business during the week."

There was no evidence that this ownership structure allowed, or even facilitated, Action and Kaja to pass inspections.  To the contrary, the record suggests that

Motley's transparency about the idiosyncratic bipartite ownership–control structure and the titular owners' minimal involvement and absence during inspections only raised suspicions, contributing to Kaja's failing score in 2016. Motley indeed deceived compliance officers into giving passing scores in 2010 and 2012, but this had nothing to do with the use of Muntz's and Brown's names. Instead, the record suggests the fraud went undetected for as long as it did due to the elaborate ghost apparatus, including a compliant procedures and policies manual; patient and personnel files; delivery logs maintained and provided to compliance officers; and even employees pretending to be patients on follow-up phone calls to compliance officers.

Even if a rational juror could find that Motley's use of her relatives' names helped pass inspections, that theory is foreclosed by the law. In *Ovsepian*, we rejected a nearly identical legal argument from the government. There, the defendant maintained a copy of a patient's identifying information without authorization in a "patient file onsite so that they would appear to be compliant with the rules in the event [the company] was audited." 113 F.4th at 1207. We held that even though keeping the patient's file "could have, and perhaps did, allow the conspiracy to continue undetected," it was not "at the 'crux' of the conspiracy to commit healthcare fraud." *Id.* at 1207–08. We found that possessing the file "onsite may have lent" "the air of legitimacy" and helped "to survive an audit," but it was ancillary to the healthcare fraud conspiracy because it "merely facilitated its commission." *Id.* at 1208. Motley's case is even weaker because there is no evidence that identifying Brown and Muntz on the enrollment forms helped the companies pass inspections.

D. *The Trial Record Fails to Establish that Motley's Use Was at the Crux.*

On this record, no rational juror could find that Motley's use of Muntz's and Brown's names was "at the crux" of the healthcare fraud. Viewed in the light most favorable to the prosecution, the evidence presented at trial was insufficient to allow any rational juror to find, beyond a reasonable doubt, that Motley's use of her relatives' names was the "specifically . . . fraudulent or deceitful manner" through which the scheme was carried out, such that it went to "the crux" of the healthcare fraud. *Dubin*, 599 U.S. at 117. The crux of the underlying healthcare fraud was billing for medically unnecessary DME and for repairs that never took place. The fact that the companies were incorporated and enrolled in Medicare under names other than that of the defendant was "merely an ancillary feature of a billing method." *Id.* at 114.

The government failed to present a theory at trial showing that Motley "use[d] the means of identification *itself* to defraud or deceive," *id.* at 123 (emphasis added), and did so "in a manner that is fraudulent or deceptive," *id.* at 132. Although the government showed that Motley's use occurred within an unlawful and fraudulent scheme, it did not show that the use *itself* was fraudulent or deceptive, either toward the identity holders or toward Medicare. Motley did not steal or use the means of identification without permission, nor did the use induce Medicare to pay claims it otherwise would have denied, nor did it shift apparent responsibility from Motley to Muntz and Brown.

This is further illustrated by the fact that when considered in isolation, there is nothing deceptive or fraudulent about Motley's use of Muntz's and Brown's

names.  Without the scheme submitting fraudulent claims for unprovided or unnecessary services, Motley's claims submissions on behalf of Action and Kaja were perfectly lawful.  Medicare does not require the individual who enrolls the supplier to be the same person who submits electronic claims.  Action and Kaja were enrolled in Medicare, and, as a lawful employee of those companies, Motley was authorized to submit claims on their behalf, even if her name was not on the enrollment forms.  Thus, in vacuo, Motley's use of her relatives' names was not fraudulent or deceptive.

The government also failed to show that the appearance of Muntz's and Brown's names on the enrollment and supplemental applications was "a key mover," *id.* at 123, or "critical to the success" of the fraud, *Parviz*, 131 F.4th at 972.  The Supreme Court in *Dubin* wanted "[t]o be clear" that "being at the crux of the criminality requires *more* than a causal relationship, such as . . . being a but-for cause of its 'success.'"  599 U.S. at 131 (emphasis added).  Here, the government has failed to demonstrate that Motley would have been unable to successfully submit claims and complete the fraud without using her relatives' names. Motley could have signed the paperwork herself; the companies could have been incorporated in Motley's name; the applications could have listed Motley.  Thus, the government did not show that, absent the use of the relatives' names on the Medicare enrollment and supplemental applications, the scheme's intended outcome would have changed.

To further illustrate the lack of a viable claim linking Motley's use of her relatives' names to the crux of what made the underlying scheme criminal, consider Motley's underlying offense.  The healthcare fraud for which Motley was convicted criminalizes, in relevant part, "obtain[ing], by

means of false or fraudulent pretenses, representations, or promises, . . . money or property . . . of[] any health care benefit program." 18 U.S.C. § 1347(a)(2). As charged in the indictment and as presented at trial, the healthcare fraud involved obtaining payments from Medicare, a healthcare benefit program, by falsely billing for DME and services that were not medically necessary and for power wheelchair repairs and supplies that were not provided. The deceit thus lay in misrepresenting the medical necessity of, or the performance of, services and supplies on Action's and Kaja's claims. The use of her relatives' names on the Medicare enrollment applications may have facilitated the fraud, but it was too attenuated from the falsification to be "at the crux." The crux of her crime was falsifying the services and supplies. Put differently, the fraud was a lie about *what* services were performed, not about *who* received or provided them. *See* Dubin, 599 U.S. at 131–32 (endorsing a Sixth Circuit heuristic that asks whether the fraud or deceit about identity "go[es] to '*who*' is involved" rather than "misrepresenting *how* and *when* services were provided" (first emphasis added)).

Thus, on this record, no rational juror could find that the use of Muntz's and Brown's names on the Medicare enrollment applications was at the crux of the fraudulent claims' objective of obtaining payments from Medicare for services and DME that were either not provided or medically unnecessary.

## III.  CONCLUSION

Although we do not lightly set aside a jury's verdict, the record here leaves us with no choice. No evidence showed that Motley's use of her relatives' names was "critical to the success" of the scheme and that the use itself was fraudulent

or deceitful—only that the names were part of a broader scheme to defraud, for which Motley will serve her time.

Because the government failed to show that Motley's use of her mother's and nephew's names was "specifically in a fraudulent or deceitful manner" and "at the crux" of the criminality of the underlying fraudulent billing, we vacate her § 1028A(a)(1) sentence and remand to the district court for further proceedings consistent with this opinion.

**SENTENCE VACATED AND REMANDED.**